*To Be Argued by Michael H. Sussman*

# 24-734

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

-----------------------------------------------------------

ROBERTO BROWNE, JADE N. PARKER,

*Plaintiffs-Appellants,*

v.

STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,

*Defendants-Appellees.*

-----------------------------------------------------------

**On Appeal from an Order and Judgment of the
United States District Court for the Southern District of New York**

---

## APPELLANTS' BRIEF-IN-CHIEF & SPECIAL APPENDIX

---

SUSSMAN & GOLDMAN
*Attorneys for Plaintiff-Appellant*
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, New York 10924
(845) 294-3991 [Tel.]
(845) 294-1623 [Fax]
sussman1@sussman.law

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF ISSUES PRESENTED...................................................2

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS .......................................................................3

    A. Harassment of Appellants................................................................3

    B. Complaints by other minority officers ...........................................10

    C. The OSI "Investigation" .................................................................14

    D. Lt. Richard Flessa's testimony .......................................................23

SUMMARY OF ARGUMENT ................................................................26

STANDARD OF REVIEW .....................................................................29

ARGUMENT .......................................................................................30

    Point I

    A reasonable jury could find that Appellee's remedial measures were
    ineffectual, evinced negligence, and failed to control a racially hostile
    work environment..........................................................................31

    Point II

    A reasonable jury could find that Appellants endured a racially
    hostile work environment ...............................................................36

i

Point III

A reasonable jury could find that the harassment Appellants
experienced was based on their race ...............................................42

CONCLUSION ...............................................................................44

CERTIFICATE OF COMPLIANCE ...................................................46

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Alfano v. Costello*,
    294 F.3d 365 (2d Cir. 2002) ........................................................26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................29, 30

*Carrero v. N.Y.C. Housing Auth.*,
    890 F.2d 569 (2d Cir. 1989) ........................................................38

*Danzer v. Norden Systems, Inc.*,
    151 F.3d 50 (2d Cir. 1998) ..........................................................30

*Duch v. Jakubek*,
    588 F.3d 757 (2d Cir. 2009) ...........................................31, 33, 35

*Gallagher v. Delaney*,
    139 F.3d 338 (2d Cir. 1998) ..................................................32, 36

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993)......................................................................36

*Holcomb v. Iona College*,
    521 F.3d 130 (2d Cir. 2008) ........................................................29

*Howley v. Town of Stratford*,
    217 F.3d 141 (2d Cir. 2000) ..................................................31, 41

*Kaytor v. Electric Boat Corp.*,
    609 F.3d 537 (2d Cir. 2010) ...................................37, 38, 40, 43

*Raniola v. Bratton*,
    243 F.3d 610 (2d Cir. 2001). ......................................................38

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)....................................................................30

*Schiano v. Quality Payroll Sys.*,
    445 F.3d 597 (2d Cir. 2006). ...........................................................37

*Williams v. N.Y.C. Hous. Auth.*,
    61 F.4th 55 (2d Cir. 2023) ............................................................38

## **Statutes**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

42 U.S.C. § 2000e-5(f)(3) ................................................................1

## **Federal Rules**

Fed. R. App. P. 4(a)(1)(A) ...............................................................1

Fed. R. App. P. 4(a)(2) .....................................................................1

Fed. R. Civ. P. 56(a)........................................................................29

## PRELIMINARY STATEMENT

Appellants Roberto Browne and Jade Paker ("Appellants') respectfully submit this brief in support of their appeal from the district court's grant of summary judgment dismissing their complaint against Appellee New York Department of Corrections and Community Supervision ("Appellee").  Appellants allege that Appellee's agents subjected them to a racially hostile and offensive work environment as set forth in the Complaint (JA-14-20) and further explicated at their depositions.  Appellee moved for summary judgment, relying upon information not disclosed in the ordinary course of discovery.  But even if accepted, that information did not resolve the material factual disputes as between the parties, and, accordingly, this district court should have denied that motion.  As such, this Court should reverse and vacate the district court's judgment and remand the matter for trial.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

As Appellants' claims arise under the Title VII of the Civil Rights Act of 1964 ("Title VII"), the district court below had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).  On March 4, 2024, the district court entered its Opinion and Order dismissing the action, and, on March 21, 2024, Appellants timely filed their notice of appeal.  The district court entered the judgment on March 22, 2024.  As such, this Court has appellate jurisdiction under 28 U.S.C. § 1291. *See also* Fed. R. App. P. 4(a)(1)(A) and 4(a)(2).

## STATEMENT OF ISSUES PRESENTED

1. Whether Appellants were subjected to a racially hostile work environment.?

2. Whether Appellee's response to this hostile work environment was negligent and failed adequately to control the workplace?

## STATEMENT OF THE CASE

On June 14, 2021, after receiving right to sue letters from the United States Department of Justice, Appellants filed their Complaint. On August 27, 2021, Appellee filed its Answer (JA-30-33). Appellee submitted its Rule 26(a) disclosure and a supplement (JA-1571-76). Neither identified Flessa or Germano as persons with knowledge of any relevant matter (*Id.*) The parties engaged in extensive discovery and the district court entered four civil case discovery plans and scheduling orders (JA-8 [ECF No. 40]).

On October 14, 2022, Appellee's counsel identified Flessa as a fact witness with respect to numerous identified subject matters (JA-1582). However, when deposed, Flessa had little information regarding any of these subjects and had not compared the assignments afforded Appellants with those given to any Caucasian Correction Officer.

In compliance with this court's rules, Appellee served its Rule 56.1 Statement of Undisputed Facts, relying upon the testimony of Michael Germano, an investgator

2

associated with its Office of Special Investigations [hereinafter "OSI"] (JA-1860-65). Germano allegedly investigated the internal discrimination complaints made by Appellants. However, at his deposition, Germano testified that he did not investigate any complaint filed by appellant Browne and could not complete interviews he deemed necessary to complete his investigation of appellant Parker's complaint.

Regardless, in August 2020, Appellee deemed closed without conclusion the Parker complaint and sent Browne correspondence indicating that his complaint also had been investigated and closed without conclusion.

In July 2023, Appellee filed its motion for summary judgment. Appellants opposed the motion. On March 21, 2024, the district court granted the motion in full. This appeal timely followed.

## STATEMENT OF FACTS

### A. Harassment of Appellants.

CO Parker is an African American Corrections Officer who started working at Otisville in October 2016 (JA-317) and received positive job evaluations (JA-1584-91).

On October 15, 2019, Parker reported that the word "RAT" was prominently written on her timecard slot (JA-1593). The next day, Parker reported to Captain Frawley that, for the last year, she was "*constantly ... harassed [sic], discriminated*

*against targeted and threatened*" (JA-1595 [emphasis added]).  Her timecards had disappeared and an envelope with a reassignment request, which she did not request, was placed in her box (JA-1595).

Within the next few days, three officers wrote to Captain Frawley, attesting to the harassment about which Parker complained.  CO Famularo explained that Parker had approached him numerous times about workplace harassment (JA-1600).  CO Tacoronte recounted that, for the prior 10 months, whenever he was in the gym, he heard four identified officers say that Parker was a "dirty officer, that she would smuggle contraband in and out of the facility," and discuss her personal Facebook page (JA-1602).[1]  CO Guinos attested that he had heard officers gossiping about Parker early in 2019 and advised her of how she was being perceived and the subsequent reputation being spread about her (JA-1604).

On October 28, 2019, Parker reported to Frawley that a poem had been left at the COs' mailbox, causing her to conclude that "no one is taking this matter seriously" (JA-1606).  A few weeks later, Parker reported that other COs were stalking her while she was on her post at unit 113 (JA-1608-09).  This conduct caused her concern and fear (*Id.*).

---

[1] Tacoronte repeated his allegations of officer mistreatment of Parker in a February 14, 2020 memorandum to Deputy Superintendent for Security ("DSS") Noeth, recounting that officers "accused CO Parker of smuggling contraband to and from the work control area, without any proof of this…" (JA-1855).

DOCCS uses a bid system for post assignments, but Parker repeatedly was assigned to inferior assignments, not to her posts. Instead, though without any entitlement to these posts, Caucasian officers received these assignments, consigning her to inferior posts and causing her to complain. Parker reported that Sgt. Firester had dishonored her bus escort bid and that this had happened repeatedly to her (JA-1612-14).

Relatedly, Parker was denied overtime, which was rewarded in contravention of a rotation system to benefit Caucasian officers [from August 2019 forward], causing her economic loss (JA-1553 ¶ 4).

On April 10, 2020, almost five months later, Parker again complained that, "as always," she was removed from a post for which she had seniority (JA-1617). On April 16, 2020, DSS Noeth affirmed [in part] Parker's grievance, writing, "If an Officer [is] awarded 2-week jobs by seniority, it will be honored. A memorandum was sent to the Watch Commander and Assistant Watch Commanders to cease the practice of bumping" (JA-1620). Five months later, Parker complained about the same inequitable assignment practices and, again, the facility sustained her grievance after the indignity (JA-1622-24, 1626).

As discussed in greater detail below, Parker sought redress through DOCCS' Office of Special Investigations ("OSI"), but that office delayed investigating her

complaint, failed to interview critical witnesses and reached no substantive conclusion regarding her complaint (JA-1628).

CO Roberto Browne is an older and more experienced officer. He came to Otisville in June 2019 (JA-53) and was almost immediately deprecated by and through the posting by the facility time clock and broader circulation of poems that were racially offensive and presented minority officers as lazy, interested in being out on worker compensation, and evading their duties. By words and phrases in the poems referring to transfers from Downstate, Brown understood that the poem referenced him as well as another Hispanic Officer, Rosado (JA-117-132, 137-146 [explaining derogatory, stereotypic references in the poems and language in the poems about his experience and background], JA-1629-34).

Like Parker, Browne's timecard was removed and tampered with on many occasions, causing him to complain to supervisors and leaving him unable to properly turn his timecards in, a fireable offense (JA-160-66, 168-69, 1636-37).[2] Browne explained, "it's not supposed to be missing. If you don't turn in your timecard within the two-week timeframe, you can get disciplined, that is why it's [timecards going missing] is happening" (JA-168). Browne received first warning memos because of his missing timecards (*Id.* at ll. 20-24). His missing timecards

---

[2] Browne was aware that the same practice affected Parker and Noble, two African American females and Spencer, his Caucasian swap partner (JA-167).

6

caused Lt. Degnan to sharply reprimand Browne and demand his times cards (JA-169, ll. 10-20).

Like Rosado and Parker, Browne had transfer slips placed in his mail slot, "essentially threatening us" (Id. at 135). His personal vehicle was vandalized while parked at work and his valve stem was cut or sliced, causing a flat tire, and requiring him to purchase a new wheel (JA-174-75, JA-181). This incident upset Browne, who described his "chest pounding" as a result of his discovery of the sliced valve stem and flat tire around the same time Officer Reed called him a scumbag, his timecards were going missing, and deprecatory poems were being posted around the facility referencing him (JA-174-75)

Caucasian officers made deprecating remarks to Browne. On one occasion Officer Reed, a white officer, questioned him about his background [pre-Otisville] and queried why the facility was getting scumbag officers (JA-96-98, JA-101). About twenty times, while at work, Browne received calls with those on the other end of the line would call him a rat or a bitch (JA-181-82).

Browne also found himself assigned to less desirable posts than those he successfully bid for and befit his seniority (JA-191-94). When he politely raised issues in real time with his supervisor, explaining that he was not receiving the bid he was awarded (JA-194-95), Sgt. Firester told him he need not honor the two-week

7

bid Browne was awarded (JA-195) and that doing so was a "courtesy."[3]  Browne knew that, for about five months, Sgt. Firester assigned less senior white officers to preferential posts (JA-200-03).  When he was bumped from his assignment and sent to a post with ill inmates, Browne questioned why less senior white officers were being assigned to the bid he should have had.  Sgt. Firester then began screaming at him, then turned the situation around and accused Brown of doing what he was doing.  As Brown explained in his Affidavit, "Ironically, a supervisor who claims he was attempting to extinguish racism in the facility was behaving in just such a manner" (JA-1559 ¶ 9).

When Browne asked what he needed to do to earn this courtesy, Sgt. Firester "turned red and just started yelling at me" (JA-196).  Sgt. Firester told Browne he was tired of him and Parker giving him a hard time (JA-196-97).  Browne told Sgt. Firester he would grieve the assignment issue as Sgt. Firester continued to reply angrily (JA-198).

Following this incident, Sgt. Firester gave Brown a formal counseling memorandum, which was placed in his personnel file and could be held against him were he again to seek promotion to the rank of sergeant (JA-199-200, JA-1639-1641, JA-1643).

---

[3] The district court cites this reason for Browne's reassignment; however, at deposition, Firester stated that he could not remember why he was reassigning Browne (JA-2157).

Previously, both at line-up and through verbal counseling, the same Sgt. Firester had blamed Browne for transporting an inmate back from a hospital in a gown when, in fact, Browne had supervisory approval for this transport and two white officers, equally responsible for the transport, were not called out (JA-149-154, JA-157-160)

Browne further explained that, even after he received a regular bid, he was frequently bumped from it, starting in March 2020, and, during the next year, assigned with other minority officers to less desirable posts (JA-203-09).

Browne filed a grievance alleging racial discrimination. OSI's Germano did not investigate it (JA-1897, JA-2098), though Browne received a letter closing his case without conclusion and claiming OSI did a thorough investigation of an allegation of IAD employee misconduct relating to him (JA-1649). Brown explained in his Affidavit:

> I brought all relevant issues to supervisors and the superintendent, but this did not cause the harassment I sustained to abate. I also note that I complained to the Superintendent who told me that she had contacted the Department's Office of Special Investigations [OSI] which was allegedly doing an investigation of my complaints and those of Sgt. Rosado and CO Parker. Initially, Felix Cotto was assigned to investigate our complaints. I spoke with him and he shared with me that he knew the those harassing me from Mid-Orange, a correctional facility which had closed in 2011. After I learned that Cotto knew those about whom we were complaining, I approached the Superintendent and told her this. A few months then passed by and Michael Germano

from Dannemora, which is near the Canadian border, was assigned the matter. But Germano never tried to interview me as part of his investigation. I did receive a document in late August 2020 which confirmed that the investigation was closed with no findings as to what happened or did not happen. This conclusion was totally unsatisfactory and, frankly, nonsensical.

(JA-1559-60).

Several months after the OSI investigation was closed, Appellee sustained Browne's grievance that sergeants were bumping [re-assigning] more senior officers [himself] in deference to less senior officers and contrary to departmental protocols (JA-1651).

**B. Complaints by other minority officers.**

The treatment of other minority officers influenced Brown and Parker's conclusion that their work environment was racially hostile. Specifically, on January 16, 2020, CO Lassiter reported that CO Watch asked her whether she was going to be on her shift all night and, when she answered affirmatively, he stated, "I don't want you here. I'm going to have you moved." CO Watch then made a phone call and Lassiter heard him exclaim, "I want her out of here." Sgt. Buda called CO Lassiter's station a few minutes later and asked her whether she wished to switch posts; she declined, and the sergeant promptly reported to her post area and took CO Watch with him (JA-1717). Sgt. Rosado wrote a memorandum confirming CO Lassiter's account (JA-1719).

In early June 2020, Sgt. Smallwood, an African American, addressed line-up and, according to Lt. Richard Flessa, gave "five examples of incidents he encountered recently with other staff, while on duty, that he considered to be harassing and discriminatory in nature toward him" (JA-1721).

In one example, in the aftermath of the George Floyd killing and consequent civil unrest, one staff member referred to protestors as "monkeys." In another incident, a facility employee met Smallwood at the gate wearing a conference flag mask as he drove into the facility (*Id.*)

DSS Noeth's response to Sgt. Smallwood's holding staff at line-up while he recounted these incidents is telling: "On June 8, 2020 I was made aware of what Sgt. Smallwood had said during line-up and found it was more of personal stories and complaints. This should never have happened . . . ." (JA-1723). Captain Frawley also claimed that addressing line-up about these issues was "not appropriate" (JA-1724). Neither supervisor addressed the underlying incidents of racial bias and insensitivity.

In mid-July, Tacoronte reported that Officer Rapp confronted him and called him a rat after he had filed prior complaints about a group of white officers (JA-1728).

Former CO Noble, an African American woman, was terminated from Otisville in August 2022 toward the end of her probationary period (JA-1736-37).

11

She experienced harassment at the facility like that endured by Appellants Parker and Browne: this started when "somebody was taking my timecard and placing [it] other places" (JA-1751). After this occurred, Noble informed her sergeants (*Id.*) But the issue persisted for about a month (JA-1770).

Noble had been trained to punch in and out of the facility upon arrival but could not do this because her timecards kept going missing (JA-1756, ll. 11-24). Indeed, looking for her timecard made her late for work, so she decided to carry her timecard to avoid this problem. However, Sgt. Conklin then wrote her up for possessing her own timecard (JA-1759). After the write-up, CO Noble went to Superintendent Barometre, who told her she should not have been written up. But after this meeting, "that is when everything started going to the left" (JA-1756-57, 1761).

After she complained to the Superintendent, "I was getting written up for everything. For anything, they written me up…nobody spoke to me…just wrote me up" (JA-1766). "I just felt like I was being harassed" (JA-1767).

At her deposition, Noble described the relentless harassment she suffered (JA-1722-27). This included being disallowed from effectuating an approved shift swap she had arranged with appellant Browne; instead, a superior contacted her in the middle of the night and demanded that she leave her infant child and drive from

Long Island to Otisville to cover the shift for which she had arranged alternative coverage (JA-1802-05).

Appellant Browne explained the state of his knowledge of these experiences and how they contributed to the racially hostile work environment:

> I am aware that other minority officers experienced much the same thing: when I came to the facility, Jade Parker shared with me her experiences. As time went on, I learned that CO Noble's timecards went missing repeatedly for about a month and she was upset about this with good cause. She began carrying her timecard and then she was disciplined for doing that. I arranged a swap of shifts with her on one specific occasion and came to work prepared to handle the shift only to be told by now Lt. Firester that my presence was not welcome and that Noble needed to report for her shift. This was ridiculous since, to my knowledge, our swap had been approved and Noble was on Long Island where she lived with her infant child. Such swaps are routinely honored as between white officers and Lt. Firester routinely honored shift swaps they arranged. A second supervisor, Sergeant Pilon, refused to let me work instead of Noble on this shift because it was impossible for her to come in. I knew that the facility would have to mandate someone to cover her shift and volunteered to do so. Pilon denied me the bid and then mandated another officer to work the shift. Under our contract, where a volunteer is willing to work a shift, as I was, such a mandate is not permitted. But, to deny me the shift, Sgt. Pilon so acted. Noble was written up for being AWOL even though she and I had arranged the shift in advance.
>
> David Tacoronte frequently advised me that white officers spoke negatively about Jade Parker and me, accusing her of smuggling contraband to inmates and me of being a rat because I exposed inmate abuse at another facility. Exposing such abuse was part of our responsibility. David also commiserated with me about the senior staffs' refusal

to honor seniority in shift assignments and manipulations made to facility records [which we both saw], facilitating the improper assignment of both bids and overtime to favor privileged white officers. CO Lassiter explained to me the response to her presence by CO Watch who, she recounted, called Sgt. Buda so he could be removed from her presence. This was a blatantly racist act as CO Watch did not even know CO Lassiter and she was plainly offended that the superior officer acceded to his demand to be transferred from her presence. These and numerous other examples informed my conclusion that racism was rampant at the facility and caused me to conclude that I was working in a hostile work environment.

(JA-1560-61).

Appellant Parker confirmed much the same:

I am very well aware of the experiences of other minority officers at the facility, including Browne, Lassiter, Noble, and Tacoronte and learned from Sgt. Smallwood that he had been exposed to various racist incidents while at the facility. These all made me feel more deeply concerned about the existence of a racially hostile environment. And, while our Superintendent seemed sympathetic to our concerns, she was very ineffective at combating the racism we experienced. She spoke of needing and seeking guidance from Albany but could not explain why the investigation into my fall 2019 complaint took many months to conclude without any real resolution. For me, this typified the agency's indifference to our concerns and experiences.

(JA-1554-55).

### C. The OSI "Investigation".

On October 18, 2018, facility Superintendent Barometre wrote to the Director of OSI, Stephen J. Maher, seeking guidance on whether to issue a Conduct in the

Workplace memo to all staff in response to Parker's initial complaints. Having been advised that DOCSS' Office of Diversity and Inclusion did not have jurisdiction over Parker's complaint, she inquired whether OSI "has any jurisdiction on this issue" (JA-1654-55). Maher responded that OSI could "take a look" and instructed a subordinate to "open a case" (*Id.*)

On the same day, Superintendent Barometre forwarded a poem left at the time clock and shared with her by appellant Browne (JA-1654). Maher inquired whether this was "on the same case involving Parker" and Barometre wrote, "[t]hey are both having the same complaints with timecards and 'harassment' and interjected each other when informing myself and their supervisors about their issues" (*Id.*).

Following this report, on October 18, 2019, Superintendent Barometre released a single memorandum entitled "Conduct within the Workplace" which generally reminded staff and supervisors of departmental rules governing civility (JA-1657).

A month later, Maher requested that Barometre provide official notification to Parker that OSI intended to interview her regarding her complaint (JA-1659). The following week, Maher directed Barometre to advise four other COS that OSI would interview them on December 2, 2019 as part of its official investigation (JA-1661-68). These four interviews were not conducted as planned; rather, seven weeks later, on January 21, 2020, Michael Germano, an Internal Affairs Investigator for OSI,

15

informed Barometre that he had had been assigned to investigate "an on-going harassment case at your facility" (JA-1670). He noted that the case "appears to involve harassment of Sgt. Rosato, Officer Brown [sic] and Officer Parker" (*Id.*) Germano advised that he worked from Dannemora but would be downstate at Otisville within the next two weeks to continue the investigation (*Id.*). By that date, the record shows no investigation had actually been commenced.

On February 3, 2020, months after Parker's complaint, Germano wrote Barometre expressing his intent to interview the same four persons Maher had identified on November 25, as well as one additional officer, and requesting guidance on who would schedule these interviews for him (JA-1672).

Barometre assigned this task to Duane Bickel and so advised Germano (*Id.*). The following day, Bickel informed Germano of the five officers' schedules or status [one was out on worker's comp] (JA-1674). But, on February 5, Germano canceled the scheduled visit and sought to reschedule it for February 10-11 (*Id.*). Bickel again advised Germano of the officers' schedules/status for those days (*Id.*). Germano then sent Deputy of Security Noeth notices for interviews for delivery to two of the five officers for February 11 (JA-1679-82).

On February 26, 2019, Barometre wrote Germano, "The issues here are escalating with several new complaints" (JA-1684-85). She attached a report in which CO Lassiter, an African American, recounted to her watch commander: "CO

16

Watch took one look at me and decided he wasn't going to work with a Black officer…There is no history between us for him to feel like working with me was going to be a problem" (JA-1686). CO Lassiter further explained, "This officer [who Brown and Parker had previously identified] is part of a clique of officers that are being accused of harassing and discriminating against other minority officers" (*Id.*) She expressed further concern because CO Watch had called a superior and sought to be moved off his assigned post rather than work with her. "I want to know who he called, that he felt so confident that he had that level of authority to have me moved. This concerns me, how high does this clique go and how deep this blatant racism goes" (*Id.*).

After receiving the Superintendent's email with CO Lassiter's complaint, Germano advised the Superintendent he would review and get back to her (JA-1688). Germano then wrote to his supervisor, Michael Lonergan, "Are [sic] plan of attack was to wait and see if things quieted down. Please see attached." Lonergan responded a half-hour later, "Apparently we need a new plan" (JA-1690).

At around this same time, after Sgt. Firester served the aforementioned formal counseling memorandum upon him, appellant Browne met with Superintendent Barometre and told her that Captain Frawley was protecting certain officers and had told him that officers about whom he was complaining participated in his wedding party (JA-211-17).

On March 6, 2020, Germano wrote Noeth seeking the schedules of ten Otisville employees so he could interview them between March 16-20. DSS Noeth responded with their schedules, noting [in part] that Sg. Firester, who Browne had accused of discrimination and harassment, had been promoted to the rank of lieutenant and was no longer at the facility (JA-1692).

More than three months later, Barometre wrote Darren Miller, DOCCS' Acting Deputy Commissioner and the Chief of OSI, "I was hoping to get an update on active cases with your office for Otisville. I am not certain where these cases stand as they have been reassigned several times. I have received 24-hour notices in the past with no shows by the OSI investigators. The last indication was a request for the schedule of several staff from Inv. Germano on 3/6/2020." Barometre's inquiry was passed down four levels to Germano.

In response, Germano noted that on June 1, 2019, he had advised his supervisor, Lonergan that "Officer Jade Parker, Officer Roberto Browne and Sgt Dwayne Rosado are alleging racial discrimination at Otisville Correctional Facility. Forms of discrimination includes harassing poems which are posted throughout the facility, writing "rat" on timecard slots, chart sergeant giving them bad jobs intentionally, and staff refusing to work with them based on their race" (JA-2214). In the same email, Germano asked his supervisor to assign four interviews to a staff member closer to Otisville, a so called "lead." Lonergan advised that he contacted

"Bobby S." on June 1, asking that he assign a more local investigator to handle the matter, but had not heard back (JA-2213).

On June 11, Doherty directed Lonergan to "cancel the lead and have Germano handle them [the interviews] in a day trip." Lonergan then advised Germano, "it appears you are going to Otisville" (JA-2213).

On June 12, Donald Oliver, OSI's Deputy Chief Investigator, queried his subordinate, Mark Doherty, concerning the next steps in the investigation. Doherty responded that "there are two more interviews" (JA-1694).

On June 15, Barometre forwarded additional documents from appellant Parker and Oliver directed Germano to add them to his case (JA-1696). The same day, Doherty directed Germano to "do what is needed to interview everyone and get the case wrapped up in 2 weeks" (*Id.*). Germano responded, "I am planning on travelling for staff interviews next week and closing the case out. Unless these staff interviews bring some sort of significant information the case will be unsubstantiated. I should be able to close the case within 2 weeks" (JA-1698).

On June 17, 2020, Germano again contacted DSS Noeth seeking the schedules of one captain [Frawley who had conducted the Otisville investigation], Sgt. Pilon, Sgt. Baez, and CO Watch between June 22-26. Noeth advised of their schedules; two of the four were not available at all. Germano sought the schedules for these

men for the first full week of July and learned that CO Watch would be off that entire week (JA-1701).

On June 26, 2020, Barometre forwarded Germano an email advising that appellant Browne had come to see her "about the lack of follow-up on his complaints." She continued, "I am seeking your assistance as there is continued tension among staff at the facility" (JA-1706). Browne's attached memorandum outlined in detail ongoing racial discrimination in assignments patterns and retaliation against Parker and other minority officers after Parker had raised issues of race discrimination the prior fall (JA-1707).

On July 7, 2020, Germano requested that DSS Noeth serve two of the four previously identified witnesses, Frawley, and Baez, with interview notices for July 9 (JA-1709-13).

On August 20, 2020, Germano wrote Doherty, his second line supervisor, that "both cases have recently been completed and ready for closure" (JA-1715). The following day Doherty and Germano wrote Browne and Parker identical notifications: "The Office of Special Investigations conducted a thorough investigation of an allegation of IAD Employee Misconduct relating to you. You were questioned by the OSI on or about 11/20/2019. This investigation is now closed. Closure does not constitute a determination of what did or did not happen" (JA-1649).

Germano admitted that he was assigned to investigate only Parker's complaint of discrimination, not Browne's (JA-2098). He was unable to interview at least five officers at Otisville he needed to (JA-2064-66). That facility's Deputy Superintendent for Security knew that Germano was unable to interview these COs (JA-2066).

The district court noted that Germano interviewed Browne for 15-20 minutes but failed to credit Browne's account of this conversation:

> I have read the deposition testimony of Michael Germano and he claims to have first spoken with me for 15-20 minutes but recalls nothing about the conversation or when it occurred. [(JA-2085-86)]. I initiated this call to find out what he was doing about our grievances, and he told me he had not begun investigating yet. He claims I then called him again and we spoke for a second time when he was off duty and at home. He recalls we spoke on this second occasion for an hour as I explained how upset I was after Sgt. Firester screamed at me and gave me a formal counseling for questioning his failure to comply with protocols regarding assignments. Germano recalls I also spoke with him about getting poor assignments which violated seniority rules. He told me this was not his issue, but to raise it with the union. What he forgets is that I told him that the union was controlled by white employees being advantaged by the deviations from seniority in both assignments and overtime. He continued to tell me to seek redress through the union and I told him that management should not allow assignments to be dominated by an overwhelmingly white union leadership which continued to disregard the seniority of minority group workers. It is interesting that, during his deposition, Germano could not remember that I told him about these issues with the union; he believes he might have told me if I were having problems with our local union, I could go to the regional

21

> or state union leadership.  He never stated any such thing.
> *Cf.* Germano Deposition at 79-80.

(JA-1562).

The district court characterized OSI's investigation as "thorough."  In so concluding, it again did not construe the record most favorably to Appellants.  As Browne explained in his Affidavit opposing grant of the motion:

> Germano claims he did a thorough investigation, but I note that he identifies Sgt. Rosado as one of the three minority employees Parker claimed had been targeted by white officers. But just like he never sought to interview me, Germano never sought to interview Sgt. Rosado. JA-2099, ll. 9-22.  In fact, by his own account, on two visits to Otisville, Germano interviewed a grand total of three people: Wood, Grady, and Sgt. Baez.  He did not interview me, or those Parker and I deemed primarily responsible for harassing us, including PO Watch, Captain Frawley, Sgt. Firester, or witnesses we identified including CO Lassiter, Sgt. Rosado, or David Tacoronte. Germano claims that he tried to interview CO Watch three or four times [Germano Deposition at 55-56] but never did so.  He testified, "Each time I attempted, he was unavailable." *Id.* Germano admits that there were five or six people he sought to interview but never did and explained his failure this way: "Trying to arrange my schedule to get down – drive the four-and-half hours down there and meet with them for the timeframe I'd be there." [(JA 2066)].  He was "a little frustrated" because each time he requested Watch's schedule, "there was a reason I couldn't [interview him]. [(JA-2071)].  To say this was a thorough investigation is insulting and misleading.

(JA-1563).

**D. Lt. Richard Flessa's testimony.**

Below, Appellee relied upon the testimony of Lt. Richard Flessa to refute the existence of racial discrimination in assignments. But such reliance underscored the lack of any meaningful defense in this case. Before his deposition, Flessa had never read plaintiffs' complaint (JA-1930) and did not know what either plaintiff was alleging (JA-1931).

By the date of his deposition, Lt. Flessa had prepared no documents or reports concerning either plaintiff, either for this litigation or otherwise (JA-1932, JA-1943). He did claim to have reviewed logbooks for housing units 118-1 and 118-2 and charts showing officer assignments from March 2020 until an unknown month in 2021 (JA-1933, ll. 15-22, JA-1935, ll. 6-10).

Lt. Flessa did not bring his notes to the deposition, and they were not theretofore produced by defendant's counsel (JA-1934-35, JA-1569 ¶ 4). During his deposition, Lt. Flessa went to his car to get his notes, though Appellee's counsel cautioned, "I don't think it's complete. I don't know how accurate it is . . . ." (JA-1939).

During the pandemic, both 118-1 and 118-2 were used as a quarantine unit for inmates with active COVID (JA-1935, l. 20-JA-1936, l. 8). Lt. Flessa was not in charge of assigning officers during this period and never spoke about them with Lt. Bickell or the daily chart sergeants who have the final say on officer assignments.

(JA-1938, ll. 15-25, JA-1950, l.15-JA-1951, l. 8). Lt. Flessa reviewed officer assignments to 118-1 between March 1, 2020, and December 31, 2021 (JA-1941, ll. 6-24). 118-1 was used for quarantine purposes for at least 6 of these 22 months, but Lt. Flessa could not be sure if that were the extent of such use because he did not receive all relevant logbooks from the AG's office (JA-1941, l. 25-JA-1942, l. 16).

For the months he had records, Lt. Flessa testified that Browne was never so assigned, and Parker was assigned to 118-1 once when it was used as a quarantine unit (JA-1943, l.13-JA-1944, l. 6). In 2020, when it was being used as a quarantine unit, Lt. Flessa found that Browne was assigned four times to 118-2 and Parker was assigned twelve times (JA-1946-47).

In conducting his analysis, Lt. Flessa did not note how many times other officers were so assigned, or who they were (JA-1947, ll.14-21). And he had no idea how it was determined who would be assigned to the quarantine units (JA-1948, ll. 6-13). He knew of no written criteria governing such assignments (JA-1948, ll. 18-25).

Bidding for posts is done by seniority and, after posts are awarded, officers who do not receive permanent posts are made part of a resource pool and can be assigned wherever needed (JA-1949, ll. 2-20). Staffing lieutenants put together two-week chart period staffing grids thirty days in advance of its start date; they would not assign officers to quarantine units because they would not know in advance when

those units would be open and need staffing (JA-1962, l. 11-JA-1967, l. 10).  Those assigned to such units would be from the resource pool, not officers with assigned posts (*Id.*).

In the relevant period, Parker bid for posts but was continually assigned as if she had not (JA-1553).  Lt. Flessa did no analysis to determine whether minority officers were over-represented in assignments to the pandemic quarantine posts (JA-1951, ll. 18-22).  He did no analysis that would allow him to comment on Parker's allegation that the facility intentionally assigned a disproportionate number of minority officers to undesirable posts in the spring 2020 (JA-1953, ll. 3-20).

Lt. Flessa had infrequent contact with Browne and Parker as they worked on Tour C, a different shift than the one he ran as watch commander on the day shift (JA-1958, ll. 2-7).

By the date of his deposition, Lt. Flessa had made no review of overtime assignments/hours and could not testify concerning that contested issue.  There are two overtime lists used at Otisville, one for volunteer and one for mandated overtime (JA-1970).  Both lists are supposed to work on a rotational basis, managed by the union and management (JA-1970-71).  By the date of his deposition, Lt. Flessa had performed no analysis of officer assignment to the Facility Health Post or outside health posts (JA-1974-76).

As watch commander of the day shift [7 am to 3 pm] between 2015 and April 2022, Lt. Flessa heard about poems defaming minority officers (JA-1978, ll. 2-9). But he was not involved in trying to determine who was disseminating these poems. (*Id.* ll. 10-13). He does not recall speaking with the Superintendent about these poems (JA-1978, l. 22-JA-1979, l. 10).

During the relevant time period, Otisville only had one captain, Frawley (JA-1979-80). Capt. Frawley never spoke with Lt. Flessa about the poems being circulated at the facility (JA-1981).

In September 2022, when he was staffing lieutenant, Captain Bey raised with Lt. Flessa the fact that CO Browne had sought a day off, was the senior seeking that day off, should have received it, but did not (JA-1983-88).

## SUMMARY OF ARGUMENT

Citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002), the district court concluded that Appellants were not subjected to a racially hostile work environment because their conditions of employment were not sufficiently severe or pervasive to alter the conditions of their employment or create an abusive working environment and because they could not identify a specific basis for imputing the objectionable conduct to their employer (SA-9).

Finding that Appellants did not cite supervisory personnel as the source of the harassment they experienced, the district court considered whether Appellants

26

sufficiently demonstrated that their employer was negligent in controlling working conditions. The district court found that Appellee was not negligent because Superintendent Barometre promptly responded to Appellants' complaints by ordering Captain Frawley to investigate and forwarding Appellants' complaints to OSI and GOER. Further, the district court found that, through the Frawley and OSI's investigation, Appellee demonstrated that it "took substantial steps to see that [Appellants'] complaint was taken seriously. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 716 (2d Cir. 1996)." (SA-12). In addition, DOCCS addressed workplace bullying by issuing a single memorandum on October 18, 2019, and directing staff to cease bullying. Through these steps, the district court held, Appellee "met its burden in establishing that it was not negligent in controlling working conditions" (SA-10-13).

Contrary to the district court's fact-finding, these cited measures were plainly ineffectual and did not meaningfully address the harassment about which Appellants complained. Indeed, much of that harassment occurred *after* these steps, and Superintendent Barometre herself recognized the inefficacy of the facility-level response and sought more assistance from Albany. Instead, she faced a lackadaisical OSI investigation, which ignored Appellant Browne's complaint altogether. Whether Appellee's response was sufficient is a jury question and it should not have been resolved by the district court.

The district court next concluded that Browne and Parker were not subjected to severe and pervasive harassment (SA-13-15). Nor, the district court concluded, were the experiences of their minority peers as impactful upon them as if they had been subjected personally to those experiences (SA-14).

The district court concluded that appellants did not show that the harassment they identified made them "unable to carry out any of their duties" or affected their performance in any way (*Id.*). Having their bids selectively disregarded was, for this district court judge, "an ordinary tribulation of the workplace," not a recurring form of race-based harassment (*Id.*). The district court concluded that Appellants "failed to describe an "objectively hostile" workplace, but rather "a collection of vignettes they found objectionable" (SA-15).

But again, respectfully, the district court usurped the jury role, improperly considering Appellants' complaints in isolation, rather than in their totality. But a reasonable jury properly viewing the workplace as a whole could find that Appellant's experienced sufficiently pervasive harassment to substantiate their Title VII claim.

Finally, the district court held that "[p]laintiff's plainly fail to show how any of the conduct of which they complain occurred because of their membership in a protected class" (SA-16). Instead, the district court found at most that Appellants experienced "workplace bullying completely detached from any discriminatory

motive." The district court described the hostility evinced repeatedly by appellants' co-workers as "episodic, isolated and unpleasant" (*Id.*). The co-workers did not, the district court concluded, use racial epithets and others were assigned in much the same way they were.

The district court improperly dismissed the experiences of Appellants' co-workers, concluding they have "no logical connection to the harassment directed at plaintiffs" and its treatment of the *Dotson* factors was both summary and erroneous (SA-18-19).

## STANDARD OF REVIEW

Summary judgment is appropriate only where the moving party establishes there is no genuine dispute as to any material fact, entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the suit and a dispute is genuine if reasonable minds may differ on its resolution. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a reasonable jury could return a verdict for the non-moving party, then summary judgment is inappropriate and the court must deny the motion. *See Id.* at 250.

The court must view the record in the light most favorable to the non-moving party, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in [its] favor." *See Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Its function "is not . . . to weigh the evidence and determine the truth of the matter but

to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ." *Id.* at 255. And "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998).

Critically, the court should review the record as a whole and, in doing so, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id*.

## ARGUMENT

A reasonable jury could find for Appellants on their Title VII hostile work environment claims, and, respectfully, the district court erred in holding otherwise and granting summary judgment dismissing their claims.

"[T]o prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment

and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer. *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quotations & citations omitted).

The district court concluded that Appellants failed to establish both prongs. Because it addressed the second prong – imputation – first, we do the same below. For the reasons that follow, the district court's analysis was flawed and its grant of summary judgment erroneous.

## Point I

**A reasonable jury could find that Appellee's remedial measures were ineffectual, evinced negligence, and failed to control a racially hostile work environment.**

"When the source of the alleged harassment is a co-worker, the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 54 (2d Cir. 2000) (quotations & citations omitted). To establish negligence in the employer's failure to take appropriate remedial action, the "plaintiff [must] show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763.

The district court held that Appellants could not establish a basis to impute the creation of the hostile work environment they experienced to DOCCS because Appellee's response to their complaints was "not negligent" and did not fail to control the workplace (SA-11-13). Specifically, it held that Appellee satisfied this standard when the Superintendent reported the complaints to GOER and OSI and issued a single memorandum in October reminding staff of the department's standards of behavior and by and through investigations conducted by Captain Frawley and by OSI (*Id.*).

Respectfully, this conclusion arrogated the proper role of the jury and represents unwarranted fact-finding. Whether DOCCS' response was or was not negligent is an issue which a jury should determine unless the court concludes that no reasonable jury could reach more than one conclusion. *See Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir. 1998) (noting highly fact-intensive nature of this inquiry and that same should be left to a jury). This is not such a case, and the factfinding the district court engaged in was improper and should be vacated on *de novo* review. *See Id.* at 49 ("While there is much merit to the district court's analysis of the situation, the issue of employer remediation must got to a jury charged with deciding the credibility of witnesses and with drawing appropriate inferences.").

First, it is clear from a recitation of the timeline of events that Appellee's response failed to "control the workplace" and that Browne, Parker and other

minority officers continued to selectively suffer hostility and indignities *after* the two specific measures the district court identified, that is the movement of the timecards and the Superintendent's issuance of a memorandum reminding staff of agency conduct rules. *See Duch*, 588 F.3d at 766 (finding question of fact as to effectiveness of remedial response where "harassment persisted an escalated during the months that followed.").

Second, Appellants identified Captain Frawley as one of those who disregarded their rights and acted in concert with those oppressing them. His investigation yielded nothing even though, indisputably, the events Appellants recounted had very recently occurred. Captain Frawley did not identify a single perpetrator of any of the events. There is no evidence that he determined who had circulated deprecatory and insulting poems around the facility. There is no evidence he determined who wrote insulting messages on Appellants' timecards or who placed in their boxes transfer requests, signaling their unwelcomeness at Otisville. There is no evidence he determined who took their timecards repeatedly.

A reasonable jury could view Frawley's investigation as a sham and a farce. As Brown explained in his Affidavit in Opposition to the motion: "I note that the defendant relies on some investigation Captain Frawley allegedly made of claims of discrimination. Yet, Lieutenant Degnan testified that Captain Frawley told him [and others] that I had made a complaint of racial discrimination which had been 'kicked

up to Albany,' meaning 'it becomes their responsibility.' Exhibit C to Yoon Declaration at 50. This suggests that Frawley never investigated this matter nor saw this as his responsibility." (JA-1564 ¶ 22).

Third, the issuance of a single memorandum reminding staff of agency rules changed nothing. Thereafter, almost all of the reported conduct continued:

- Parker was stalked by Caucasian officers while on her bid; Browne's car was vandalized on facility grounds;

- CO Taraconte overheard the same baseless and vicious rumor mongering accusing Parker of distributing contraband to inmates;

- Sgt. Firester verbally abused Browne after refusing to honor his bid and wrote a bogus counseling memorandum; superiors repeatedly assigned CO Parker to guard quarantined inmates more than any other officer;

- Smallwood witnessed officers making overtly racist comments, *i.e.*, calling the George Floyd protestors "monkeys" and entering the state correctional facility in masks bearing the Confederate Flag;

- Noble and Browne were denied the same swap shift privileges white officers routinely utilized; and

- Parker and Browne repeatedly had their bids dishonored in favor of less senior Caucasian officers.

A reasonable jury could find that the circulation of a single memo and changing how timecards were kept represented minimal interventions hardly commensurate with the level of racial hostility directed at minority Correction Officers, including Appellants, at Otisville and, more critically, that these responses were superficial and patently ineffectual, as the abuse continued thereafter.

Likewise, a reasonable jury could reject reliance on the OSI investigation to demonstrate an absence of negligence. That investigation was not concluded for *ten months* after Superintendent Barometre forwarded Appellants' complaints to Albany. *See Duch*, 588 F.3d at 766 (finding question of fact as to effectiveness of remedial response where "a formal investigation . . . was not commenced until . . . *three months* after the date upon which a jury could find that [defendant] first learned of the harassment." (emphasis in original)).

Indeed, Browne's several complaints were never investigated. OSI depended on the facility, specifically Captain Frawley, to schedule interviews, but, frequently, he did not do so. Accordingly, by conclusion, OSI had not even interviewed several persons of interest. And, again, OSI could not deny that the events Appellants recounted had occurred; it simply failed to attribute this conduct to anyone specific or to recommend any punishment or remedial measures. Germano tried to interview others, but Captain Frawley and the Superintendent did not mandate those officers to cooperate with the investigation and Germano never interviewed them, though he

identified them within the first month of his investigation as requiring interviews (JA-2046-48).

Accordingly, when this and the earlier Frawley investigation ended, no one had been or was ever held responsible for anything which had occurred at the facility, a powerful message to those who engaged in the myriad of objectionable conduct that they could "do it again," as they did to CO Noble, taking her timecards and placing transfer request forms in her mailbox.

In short, while the district court reached one conclusion from this record, a reasonable jury could permissibly reach the opposite conclusion and find that Appellee's response was not sufficiently "prompt, appropriate, and adequate." *Gallagher*, 139 F.3d at 348. And so a jury could rationally impute the creation of the hostile work environment to Appellee.

## Point II

### A reasonable jury could find that Appellants endured a racially hostile work environment.

The district court next held that, even if Appellants could impute liability to Appellee, they failed to demonstrate harassment that is sufficiently severe or pervasive (SA-13-15). Again, respectfully, this holding was erroneous.

To sustain a Title VII hostile work environment claim, Appellants must demonstrate harassment "that is sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment."

36

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). This is both an objective and subjective test. *See Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 604 (2d Cir. 2006). Importantly, "environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.'" *Harris*, 510 U.S. at 22 (emphasis added). Accordingly, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Schiano*, 445 F.3d at 606 (emphasis added).

Courts must evaluate the totality of the circumstances and consider a number of factors, including, without limitation, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris*, 510 U.S. at 23. Moreover, courts should consider the cumulative effect of all the relevant conduct "and a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

Facially race-neutral conduct may qualify as race-based harassment if there is some circumstantial or other basis for inferring that incidents race-neutral on their face were in fact discriminatory, and, given proof of instances of overt racial hostility . . . a rational juror could permissibly infer that [a supervisor's] entire alleged pattern of harassment against [plaintiff] was motivated by race. *See Id.*; *Raniola v. Bratton*, 243 F.3d 610 (2d Cir. 2001). Finally, a minority group member need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII. *See Carrero v. N.Y.C. Housing Auth.*, 890 F.2d 569 (2d Cir. 1989).

Applying these principles here, both appellants suffered a series of indignities in a relatively short period of time which targeted them and made hostile and intolerable their work environments.

In assessing the nature of the work environment, the district court disaggregated the various instances and failed to view them all in their totality, something this Court has repeatedly held is improper. *See*, *e.g.*, *Kaytor*, 609 F.3d at 548 (warning that, when evaluating harassment claims, "the court should not view the record in piecemeal fashion."); *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 73-75 (2d Cir. 2023) (emphasizing importance of the "totality of the circumstances" analysis in hostile work environment claims).

While the district court treated each incident as if it were the only one affecting them, in fact, they were both subjected to repeated instances of unaddressed harassment including: (1) isolation at work, (2) stalking at work, (3) vandalism at work, (4) removal of time cards at work preventing them from accurately recording and reporting the time they worked, (5) spreading of derogatory and false rumors about them at work, (6) receiving "transfer requests" in their boxes which invited them to leave the facility, and (7) repeated disrespect of their bid assignments by supervisors who gave their bids to junior Caucasian officers and Parker's over-assignment to the most risky bids involving quarantined inmates during COVID. These actions were not episodic; they were sustained and repetitive and, because no one took responsibility, or was held responsible for many of these acts, the workplace in its entirety became more suspect and hostile for both Appellants. And, when viewed together and in their totality – as opposed to separately and piecemeal – a reasonable jury could find harassment to be sufficiently pervasive.

Also informing the analysis is the fact that Parker and Browne were aware of other incidents experienced by other minority COs in the same time frame, including: (1) poems being circulated and posted around the facility ridiculing officers who had transferred into the facility [Browne being one of them] in racially stereotypic terms; (2) the refusal of an officer to work with an African American CO; (3) the supportive response by a supervisor to that officer's demand not to work

39

with the African American officer; (4) the racist comments by several Correction Officers made in the presence of Sgt. Smallwood and Captain Frawley's response to the sergeant's effort to reveal and discuss these comments at line-up; (5) the racist comments made by a Corrections Officer a few weeks later, which were neither interrupted nor rebuked by any superior officer at lineup; (6) the facility's refusal to honor the shift swap arranged with Browne by CO Noble and its insistence that she report in the middle of the night to work; and (7) the same treatment accorded Noble as they experienced with regard to timecard theft.

Again, as this Court has made clear, since courts must consider the workplace as a whole and the cumulative effect of all the relevant conduct "a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Kaytor*, 609 F.3d at 547. A reasonable jury could view the amalgamation of the incidents Appellants directly experienced along with those they knew other officers experienced as sufficiently severe and pervasive to constitute a racially hostile work environment. White officers were simply not subjected to any of this conduct, let alone all of it, as Appellants were.

The district court simply whitewashed the conduct, minimizing its severity and impact. Particularly in a correctional facility, where officers must respect and rely on each other for their own safety, such blatant disrespect severely affects those

officers subjected to such behavior. *See*, *e.g.*, *Howley*, 217 F.3d at 154 (noting sexual harassment of a commanding officer of a fire department was sufficiently severe, in part, because "in an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters.")

And, contrary to the district court's conclusion, the experience of other officers can and did contribute to the Appellants' subjective appreciation of their environment, an element of any hostile work environment claim. Appellants offered this notice testimony because of the impact of these reported experience on them, not to establish the underlying truth of what happened in each situation.

In short, the record is replete with ongoing and escalating incidents of abuse and harassment of Appellants directly and other officers of color, about which Appellants were aware. The district court failed to consider all of these incidents in their totality and to view the workplace as a whole. Instead, it improperly disaggregated the incidents to conclude that each, separately was insufficiently severe or pervasive. And it also failed to construe the evidence in the light most favorably to Appellants. This constitutes reversable error.

## Point III

**A reasonable jury could find that the harassment Appellants experienced was based on their race.**

Finally, the district court held that Appellants had not shown any link between the serial hostility evinced toward them and their race/national origins. It found no direct statements or announcements to the effect that those engaging in the behavior hated people of color. But the demand for this measure of direct evidence was and remains profoundly misguided and is not required to sustain a hostile work environment claim. Rather, Appellants showed that they and other officers of color, not Caucasian officers, were subject to the succession of indignities presented described above. While the district court notes that a single white officer, Browne's partner, had his timecards removed, he did not suffer any of the other indignities alleged. Only Browne and Parker, and other minority officers, did.

Again, considering the nature of the behavior, calculated to make both Appellants and other minority officers feel unwelcome and to force them out of Otisville, a reasonable juror could conclude that their race contributed to the animus displayed. Certainly, Appellee has presented no other basis for this sustained harassment and, had it done so, this would have presented a question for jury resolution – the intent of those engaging in this conduct.

And, critically, Superintendent Barometre's increasingly urgent pleas for help to Albany expressly corroborate that racial tensions were escalating at the facility and that she needed help defusing them.

As this Court explained in *Kaytor*: "In sum, the question of whether considerations of the plaintiff's [protected class] caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, and an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. Thus, especially in the context of a claim of [unlawful] harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion and *summary judgment should be used sparingly*." 609 F.3d at 548 (quotations and citations omitted) (cleaned up) (emphasis added).

In short, taken as a whole, the evidence presented demonstrates that Appellants and other officers of color experienced ongoing and pervasive workplace harassment that was not similarly experienced by white officers. And facility leadership recognized the racial tensions these incidents were causing. Contrary to the district court's analysis, this is not just a case where a Black employee has a negative experience and simply concludes that it must be because he is Black. Rather, the disparate and more favorable treatment of Caucasian employees and the theme of the harassment – to demean and exclude officers of color through racial tropes and stereotypes – evinces sufficient circumstantial evidence from which a

reasonable jury could find that the harassment was based upon Appellants' race. While a jury might reach the same factual conclusion as did the district, it is not required to, and so the district court should not have decided this factual issue against Appellants on this summary judgment motion.

## CONCLUSION

The district court improvidently granted summary judgment, holding Appellants to a heightened standard of proof and ignoring Congress's express desire to extirpate racial discrimination from our national life. Applying more exacting standards to such claims contravenes this intent. Finding that Appellants' race discrimination claims amount to nothing more than "I am Black and something bad happened to me and it must be because I am Black" trivializes the life experiences of these Appellants and devalues the importance of the legal protections Congress has enacted. Appellants watched as Caucasian officers received better bids regardless of seniority; they were insulted and humiliated in the workplace by tropes that associated them with laziness and smuggling contraband. The district court's extensive fact-finding overstepped its rightful role and should be firmly rebuked by this Court. Summary judgment should be vacated and the matter remanded for trial.

Dated:     Goshen, New York
             July 3, 2024                    Respectfully submitted,

                                        SUSSMAN & GOLDMAN
                                        *Attorneys for Plaintiff-Appellant*

                                    By:   */s/ Michael H. Sussman*
                                          Michael H. Sussman, Esq.
                                          1 Railroad Avenue, Ste. 3
                                          P.O. Box 1005
                                          Goshen, New York 10924
                                          (845) 294-3991 [Tel.]
                                          (845) 294-1623 [Fax]
                                          sussman1@sussman.law

### CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,266 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Time New Roman 14-point type for text and footnotes.

# SPECIAL APPENDIX

# SPECIAL APPENDIX
# TABLE OF CONTENTS

District Court Opinion & Order, entered March 4, 2024 ................................... SA-1

Judgment, entered March 22, 2024.................................................................. SA-21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERTO BROWNE and JADE N. PARKER,

                          Plaintiffs,

           - against -

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION,

                          Defendant.

---

**OPINION & ORDER**

21-CV-05240 (PMH)

PHILIP M. HALPERN, United States District Judge:

    Roberto Browne ("Browne") and Jade N. Parker ("Parker" and together, "Plaintiffs")
commenced this action on June 13, 2021 against the State of New York and the New York State
Department of Corrections and Community Supervision ("DOCCS" or "Defendant").[1] (Doc. 1,
"Compl."). Plaintiffs press one claim for relief for hostile work environment in violation of Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (*Id.*). Defendant filed
an Answer to the Complaint on August 27, 2022 (Doc. 17), and the parties engaged in discovery
pursuant to the Civil Case Discovery Plan and Scheduling Order (Doc. 40). Discovery concluded
on November 30, 2022. (Doc. 40).

    Pending before the Court is Defendant's motion for summary judgment made pursuant to
Federal Rule of Civil Procedure 56. (Doc. 60). Defendant filed, pursuant to the briefing schedule
set by the Court, its motion for summary judgment on July 7, 2023. (Doc. 50, "56.1 Stmt."; Doc.
61, "Def. Br."; Doc. 62, "Yoon Decl."; Doc. 63, "Barometre Decl."; Doc. 64, "Firester Decl.";
Doc. 65, "Germano Decl."; Doc. 72, "Flessa Decl."). Plaintiffs filed their opposition papers (Doc.

---

[1] Plaintiffs filed a Notice of Voluntary Dismissal as to the State of New York on August 23, 2021 which
dismissed their claims against the State of New York with prejudice. (Doc. 16).

69, "Pl. Br."; Doc. 70, "Parker Decl."; Doc. 71, "Browne Decl."; Doc. 75, "Sussman Decl."), and the motion was fully briefed with the filing of Defendant's reply. (Doc. 73, "Reply").

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

## <u>BACKGROUND</u>

The Court recites the facts herein only to the extent necessary to adjudicate the motion for summary judgment and draws them from the pleadings, Defendant's Rule 56.1 Statement and Plaintiffs' responses thereto, and the admissible evidence proffered by the parties. Unless otherwise indicated, the facts cited herein are undisputed.

Browne and Parker work as correction officers at Otisville Correctional Facility ("Otisville"). (56.1 Stmt. ¶ 1). Parker is an African American woman who started working at Otisville in October 2016 and Browne is a black Latino man who started working in Otisville in June 2019. (*Id.* ¶¶ 1-2). Parker currently works the "Tour 3" shift, which is the shift that Parker specifically requested. (*Id.* ¶ 2). Browne currently works the school building and gym post, which is the post that Browne specifically requested. (*Id.* ¶ 3).

I.   <u>Harassing Conduct</u>

Parker received comments from other correction officers that she preferred associating with incarcerated individuals after she posted a photo on her Facebook page of herself with a friend who was an incarcerated individual. (Yoon Decl., Ex. B, "Parker Dep. Tr." at 57:9-62:12). Parker did not report these comments to her supervisors. (*Id.* at 62:10-12). When Parker was working the inmate bus post, other correction officers would stop her car and check if she was bringing any contraband into the facility. (*Id.* at 79:19-88:21). Parker believed that the correction officers would check her car for contraband because she was friends with another correction officer who got in trouble for bringing contraband into the facility. (*Id.* at 80:14-81:7). Parker was asked to testify at a disciplinary hearing regarding an incarcerated individual that was written up for not carrying a

bus pass and testified that she was not present for the incident in question. (*Id.* at 62:21-66:16). As a result of Parker's testimony at the disciplinary hearing, Correction Officer Lear told other correction officers that Parker was a "rat" and did not "stick up for the blues." (*Id.* at 66:3-16). Sometime in October 2019, Parker reported that the word "rat" was written on her timecard slot. (*Id.* at 107:24-109:11).

In October 2019, Correction Officer Reed referred to Browne as a "scumbag" and implied that Browne was involved with the prosecution of correction officers at another DOCCS facility. (Yoon Decl., Ex. A, "Browne Dep. Tr." at 59:24-61:24). Around that same time, an unidentified individual cut a valve stem on Browne's car while it was parked at Otisville. (*Id.* at 138:12-142:21). Browne received prank calls from unidentified individuals calling him a "rat bitch." (*Id.* at 146:25-147:22). Unidentified individuals also placed blank transfer request forms in his mailbox, encouraging him to request a transfer and leave Otisville. (*Id.* at 98:18-99:19). An unidentified individual posted three poems in the room where the correction officers clocked in and out sometime in November 2019. (*Id.* at 81:12-82:20). These poems were titled, "The Prince of Otisville", "Tattooed Man Decides to Stay", and "Tattooed Man Comes up with a Plan." (Sussman Decl., Ex. 26). The three poems refer to a "tattooed" Otisville correction officer but do not reference the race, ethnicity, or national origin of any correction officer. (*Id.*). Neither Browne nor Parker is mentioned in any of the poems. (56.1 Stmt. ¶ 50). Browne does not have any tattoos. (*Id.* ¶ 48). Browne and Parker believed that the three poems were about a "Sergeant Rosado" or a "Sergeant Rosario." (Browne Dep. Tr. at 93:2-21; Parker Dep. Tr. at 152:5-22).

Both Browne and Parker had their timecards go missing on more than one occasion in October 2019. (Browne Dep. Tr. at 124:18- 125:21; Parker Dep. Tr. at 115:23-116:23). Correction Officer Spencer, a Caucasian male, also had problems with the tampering of his timecards. (56.1

Stmt. ¶ 7). Parker and Browne reported their timecards going missing, and subsequently Superintendent Barometre issued a memorandum titled "Conduct Within the Workplace" and ordered the staff supervisors to read out the memorandum and discuss it in detail at the beginning of the daily lineup meeting with the correction officers. (*Id.* ¶ 32). Staff supervisors read the memorandum and ordered the correction officers to cease any harassment, stating it would not be tolerated and to avoid misplacing timecards. (*Id.* ¶ 35). The correction officers were then instructed to stamp their timecards and bring them back to the sergeant's office instead of leaving them in the timecard slots. (*Id.* ¶ 6). After the correction officers placed their timecards in the sergeant's office, the timecards stopped going missing. (*Id.*).

Housing Units 118-1 and 118-2 were used to quarantine incarcerated individuals who were exposed to COVID-19. (*Id.* ¶ 8). These housing units were also used to house certain incarcerated individuals unrelated to the COVID-19 quarantine. (*Id.*). From February 2020 to February 2021, Browne was assigned to Housing Units 118-1 or 118-2 on four occasions while they were being used to quarantine individuals exposed to COVID-19, and Parker was assigned to those units on twelve occasions while they were being used to quarantine individuals exposed to COVID-19. (*Id.* ¶¶ 10-11). From February 2020 to February 2021, many other correction officers were assigned to Housing Units 118-1 and 118-2 multiple times, although no correction officer was assigned to those units as frequently as Parker. (*Id.* ¶ 12).

Sergeant Firester changed Browne's post from Housing Unit 113 to Housing Unit 118-2 on February 25, 2020. (*Id.* ¶ 26). Browne was working as a resource officer at the time. (Browne Dep. Tr. at 78:25-79:2, 167:4-6).[2] Resource officers are assigned as directed to the posts that need

---

[2] Parker was also working as a resource officer during 2019 and 2020. (Parker Dep. Tr. at 25:9-24). After working as a resource officer for four years, she obtained sufficient seniority to request a specific post. (*Id.* at 26:7-27:7). Parker specifically requested, and received, the gym post. (*Id.*).

coverage. (Firester Decl. ¶ 5). When the officers assigned to specific posts are absent or if there are new temporary posts that need to be filled, resource officers are assigned to those posts. (*Id.*). Browne initially refused to comply with Firester's order to leave his office and go to the assigned post and Firester issued Browne a formal counseling. (56.1 Stmt. ¶ 28). Browne claims that Firester yelled at him during the February 25, 2020 exchange. (Browne Dep. Tr. at 158:25-162:16). The formal counseling form issued by Firester to Browne states that after Firester told Browne his assigned post, Browne "continued to be argumentative, demanding to be placed in the particular job already discussed." (Sussman Decl., Ex. 30). The formal counseling that Firester issued was later dismissed by Superintendent Barometre. (56.1 Stmt. ¶ 28). Browne did not receive any further discipline following the February 25, 2020 formal counseling. (*Id.* ¶ 29).

II.   Complaints of Harassment by Other Correction Officers

On January 16, 2020, Correction Officer Lassiter—an African American woman—wrote a memorandum to Lieutenant Smith complaining of harassment in the workplace. (56.1 Stmt. ¶ 8; Sussman Decl., Ex. 55). Lassiter described an incident that took place on January 16, 2020 when she was assigned to work a shift with Correction Officer Watch, who told Lassiter that he did not want to work with her. (*Id.*). On February 14, 2020, Correction Officer Tacoronte—a Hispanic man—wrote a memorandum to D.S.S. Noeth complaining of harassment in the workplace. (Sussman Decl., Ex. 62). Tacoronte complained that Correction Officers Rios and Degarger "started spreading rumors that [he] was giving rides to inmates without bus passes." (*Id.*). On June 4, 2020, Sergeant Smallwood reported to D.S.S. Noeth that he overheard a discussion amongst a group of correction officers regarding news coverage of "the riots that were going on in the country" during which some unidentified correction officers referred to the rioters as "monkeys." (Sussman Decl., Ex. 57).

III.   Plaintiffs' Complaints and DOCCS Response

During the relevant period, DOCCS maintained policies to prevent harassment and discrimination of its employees on the basis of race and maintained a policy to report and investigate allegations of harassment and discrimination. (56.1 Stmt. ¶ 36). Parker and Browne sent Otisville Superintendent Barometre written complaints—in October and November of 2019— regarding harassment from co-workers. (Barometre Decl. ¶ 8). Superintendent Barometre ordered Captain Frawley to conduct an investigation of Plaintiffs' complaints of harassment upon receipt of the complaints. (56.1 Stmt. ¶ 39). Captain Frawley interviewed Correction Officers Milyko, Reed, Watch, and Sergeant LaForge as a part of his investigation, all of whom denied participating in or witnessing the conduct reported by Plaintiffs. (*Id.* ¶ 40). The DOCCS Office of Special Investigations ("OSI") independently conducted an investigation into Plaintiffs' complaints of harassment. (*Id.* ¶ 46). Investigator Germano, who was assigned to the case, investigated the complaints by interviewing eyewitnesses and officers accused of participating in the harassing acts. (*Id.* ¶¶ 46, 52). Germano also reviewed several To/From memoranda concerning the complaints and compared the handwriting of another correction officer to the "rat" handwriting on Parker's timecard slot. (*Id.* ¶ 53). The OSI concluded, after the completion of Germano's investigation, that Plaintiffs' complaints of harassment were unsubstantiated. (*Id.* ¶ 54). Parker also submitted complaints directly to the Governor's Office of Employee Relations ("GOER"). (*Id.* ¶ 44). The GOER stated that they did not have jurisdiction to investigate the complaints because the conduct at issue "did not appear to involve harassment or discrimination on the basis of race." (*Id.* ¶ 45).

## **STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at \*4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[3] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). "The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at \*5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. *Porter v. Dartmouth-Hitchcock Medical Center*, 92 F.4th 129, 147 (2d Cir. 2024) ("[T]he court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The task is material issue spotting, not material issue determining. Therefore, "where there is an

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Further, "while the court is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 2024 WL 439465, at *14 (quoting *Kaytor*, 609 F.3d at 545). "In determining whether genuine issues of fact exist, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence." *Moll v. v. Telesector Res. Grp., Inc.*, No. 20-3599, 2024 WL 820179, at *4 (2d Cir. Feb. 28, 2024) (citing *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 10 2019)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)). "In sum, 'summary judgment is proper only when, with all permissible

inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict.'"

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[ ] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

## ANALYSIS

Title VII bars employers from discriminating based on sex in the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). "A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The Second Circuit has instructed courts, on summary judgment, to "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 20 (2d Cir. 2014). "Of course, it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under

Title VII only when it occurs because of an employee's protected characteristic, such as race or national origin." *Rivera*, 743 F.3d at 20.

I.    Imputing Liability on DOCCS

Plaintiffs' employer, DOCCS, is the only defendant in this action. Plaintiffs allege that the racially hostile work environment at Otisville was the result of the conduct of both their supervisors and co-workers. The Supreme Court held in *Vance v. Ball State Univ.* that "[u]nder Title VII, an employer's liability for such harassment may depend on the status of the harasser." 570 U.S. 421, 424 (2013). The Supreme Court articulated the following distinction between a Title VII hostile work environment claim where the harassing employee is the victim's co-worker versus the victim's supervisor.

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Id.* The Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* "Tangible employment actions" constitute conduct that results in "a significant change in employment status such as hiring, firing, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431.

Courts in this Circuit have held that sergeants and lieutenants working in DOCCS facilities can be considered supervisors for purposes of vicarious liability under Title VII. *See Rock v. Blaine*, No. 14-CV-01421, 2018 WL 1415202, at *10 (N.D.N.Y. Mar. 20, 2018); *Cole v. New York*

*State Dep't of Corr.*, No. 15-CV-00876, 2017 WL 1194233, at *12 (N.D.N.Y. Mar. 30, 2017). The only harassing conduct by a supervisor for which Plaintiffs offer evidence is Sergeant Firester yelling at Browne on February 25, 2020 and issuing him a formal counseling, which was later dismissed by Superintendent Barometre. (56.1 Stmt. ¶¶ 28-29). None of the other harassing conduct complained of by Plaintiffs—besides the February 25, 2020 interaction between Firester and Browne—involved a supervisor. The formal counseling issued by Firester is not the type of conduct under which DOCCS can be held strictly liable because it did not result in a "significant change in [Browne's] employment status" especially considering that the formal counseling was subsequently dismissed. *Vance*, 570 U.S. at 431.

Given that Plaintiffs have failed to establish that a supervisor engaged in harassment that culminated in a tangible employment action against Plaintiffs, DOCCS can only be liable "if it was negligent in controlling working conditions." *Id.* at 424. The record here shows that Superintendent Barometre promptly responded to Plaintiffs' complaints by ordering Captain Frawley to conduct an investigation and by forwarding Plaintiffs' complaints of harassment to the GOER and OSI. (56.1 Stmt. ¶¶ 38-39). Captain Frawley conducted an investigation that included the interviews of Correction Officers Milyko, Reed, Watch, and Sergeant LaForge, all of whom denied witnessing the acts reported by Plaintiffs. (*Id.* ¶ 40). The OSI conducted an independent investigation which similarly concluded that there was no evidence or witnesses to corroborate Plaintiffs' complaints. (*Id.* ¶ 55). The GOER concluded that Plaintiffs' complaints did not appear to involve harassment or discrimination on the basis of race. (*Id.* ¶ 45). The GOER repeatedly attempted to contact Parker, but were unsuccessful in doing so. (Barometre Decl. ¶ 18, Ex. E). Parker did not provide sufficient information for the GOER to conduct an investigation into the harassing conduct she complained of. (*Id.*).

Plaintiffs generally argue that "DOCCS conducted no meaningful investigation of [P]laintiffs' complaint of discrimination." (Def. Br. at 23-27). Plaintiffs more specifically argue that the DOCCS investigation could not have been thorough because the investigators "never interviewed Browne." (Def. Br. at 27). Plaintiffs fail to address, in making this argument, Captain Frawley's investigation of the alleged harassment. Frawley described his investigation and conclusions in a memorandum to Superintendent Barometre dated October 25, 2019. (Barometre Decl., Ex. C). Frawley states in this memorandum that he interviewed Browne on October 17, 2019, along with his interview of Milyko, Reed, Watch, and LaForge. (*Id.*). Browne states in his declaration, with respect to the OSI investigation, that he spoke with Germano for "15-20 minutes" during which he explained to Germano "how upset [he] was after Sgt. Firester screamed at me." (Browne Decl. ¶ 17). Frawley, in addition to interviewing Browne and other correction officers, received and reviewed memoranda from Correction Officers Tacorante, Gumbs, and Famularo regarding the allegations of harassment made by Plaintiffs. (Barometre Decl., Ex. C). Plaintiffs argue that the investigations conducted by DOCCS and the OSI were deficient because the investigators could have done more. That is not the standard that Defendant must satisfy. Rather, Defendant must establish that it "took substantial steps to see that [Plaintiffs'] complaint was taken seriously." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 716 (2d Cir. 1996). The internal investigation by DOCCS and the independent investigation by the OSI—which included interviews of more than five correction officers as well as the review of written memoranda from least three additional correction officers—are plainly the "substantial steps" that were needed to be taken to see that Plaintiffs' complaints were address. *Id.*

The record further shows that DOCCS took action to address workplace bullying by issuing a memorandum titled "Conduct Within the Workplace," on October 18, 2019, which was read out

loud at the beginning of the lineups all correction officers are required to attend before each shift for several days. (*Id.* ¶ 35). At the lineups during this time period, staff supervisors specifically ordered the correction officers to cease any harassment, tampering of timecards, and posting of poems, and announced that such acts would not be tolerated. (*Id.*). DOCCS also changed the procedures regarding the timecards so that correction officers were instructed to stamp their timecards and bring them back to the sergeant's office, which solved Plaintiffs' problem of their timecards going missing. (*Id.* ¶ 6). The Court concludes, after considering the totality of the circumstances, that Defendant has met its burden in establishing that it was not negligent in controlling working conditions. *See Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612, 614 (2d Cir. 2009) (holding that an employer's response was a "reasonable remedial measure" where the response included an investigation seeking to identify the perpetrator, issuance of a "cautionary memorandum to all employees", and the maintenance of "anti-harassment policies" during the relevant period); *LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-00023, 2023 WL 6610764, at *14 (S.D.N.Y. Oct. 10, 2023) ("because Defendants took swift remedial action upon becoming aware of the alleged misconduct, Plaintiff fails to show that the alleged misconduct by her co-workers should be imputed to her employer").

Accordingly, liability for Plaintiffs' claim of hostile work environment in violation of Title VII may not be imputed to DOCCS as a matter of law and Defendant's motion for summary judgment is GRANTED.

II.   <u>Severe or Pervasive Harassment</u>

Even if DOCCS could be imputed with liability under Title VII, Plaintiffs' claim separately fails because they have failed to establish that the harassment was sufficiently severe or pervasive. To establish a hostile work environment under Title VII, "a plaintiff must show that the workplace

is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015). Plaintiffs fail to meet this standard. Plaintiffs were subjected to comments about them being "rats" or "scumbags", their timecards going missing, and prank calls over a two-year period. The fact that Plaintiffs learned of many of the comments at issue secondhand undercuts their claim because "secondhand comments are not as impactful as on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim." *LaFontant*, 2023 WL 6610764, at *13 (collecting cases).

It is undisputed that Plaintiffs' timecards stopped going missing after DOCCS instituted a policy of placing those timecards in the sergeant's office. (56.1 Stmt. ¶ 6). Plaintiffs have failed to adduce any evidence that they were unable to carry out any of their duties as a result of the conduct at issue, or that their performance was affected in any way. The record is clear that Plaintiffs were subject to mean-spirited gossip and bullying in the form of prank calls and someone hiding their timecards. Plaintiffs have failed to meet their burden in showing that this conduct, while distasteful, altered the conditions of their employment. "Title VII is not a general civility code but rather forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020). Plaintiffs' disputes regarding not receiving their preferred shift is likewise not severe or pervasive but rather is an "ordinary tribulation of the workplace" that does not rise to the level of a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Montanez v. McDean LLC*, 770 F. App'x 592, 594 (2d Cir. 2019) (no hostile work environment where restaurant manager made sexual jokes and comments, screamed at plaintiff in front of customers,

and assigned plaintiff disfavored responsibilities); *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (a supervisor being "rude and hostile" to plaintiff on several occasions did not rise to the level of a hostile work environment and reflected only a "fraught relationship" between plaintiff and her supervisors).

Plaintiffs failed to describe an objectively hostile workplace; rather, at most, they have "described a collection of vignettes that [they] found objectionable." *Reyes v. Westchester Cnty. Health Care Corp.*, No. 19-CV-08916, 2021 WL 310945, at \*10 (S.D.N.Y. Jan. 29, 2021). The record here stands in stark contrast with *Moll*, where the Second Circuit held that summary judgment was inappropriate on a Title VII hostile work environment claim where plaintiff proffered evidence "that overtly sexual or sexist comments, sexual innuendos, and gender-based disparagements were regularly directed at women" and "some managers participated in such conduct" and despite the plaintiff's complaint, the employer "did nothing in response." 2024 WL 820179. Plaintiffs were not subjected to any overtly racial or racist comments either by co-workers or by their supervisors. When Plaintiffs complained of the conduct, DOCCS promptly initiated an internal investigation and referred the complaints to the OSI, who initiated their own independent investigation. DOCCS took reasonable remedial measures in response to Plaintiffs' complaints— Plaintiffs' timecards stopped going missing after they were placed in the sergeant's room, and Plaintiffs were not called "rat" after Superintendent Barometre's memorandum to the staff—which effectively curtailed some of the conduct at issue. Plaintiffs have failed to establish that they were subjected to a harassment that was sufficiently severe or pervasive such that it altered the conditions of their employment.

III.   <u>Link Between Harassment and Membership in a Protected Class</u>

"Mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's protected

characteristic." *Harge v. City of New York*, No. 21-2293, 2022 WL 17481819, at *2 (2d Cir. Dec. 7, 2022). Plaintiffs plainly fail to show how any of the conduct of which they complain occurred because of their membership in a protected class. The conduct Plaintiffs complain of—timecards being misplaced, co-workers gossiping, the word "rat" being written one time on a timecard slot, poems that do not reference either Plaintiff being posted in a common area, and disputes about shift assignments—"amount to, at most, workplace bullying completely detached from any discriminatory motive." *Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 596 (2d Cir. 2010). Plaintiffs fail to point to any facts beyond the conclusory and speculative assertions in their declarations that the hostility arose because of their race.

As Judge Seibel concluded in *Sherman v. Yonkers Pub. Sch.*, "[a]llegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class." No. 21-CV-07317, 2023 WL 137775, at *11 (S.D.N.Y. Jan. 9, 2023); *see also Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-08812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-07352, 2008 WL 5191394, at *4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient."). The episodic, isolated, and unpleasant exchanges Plaintiffs had with their co-

workers, cannot be the basis of a hostile work environment claim because there is no evidence of a link between the alleged hostile conduct and Plaintiffs' membership in a protected class. None of the comments directed at Plaintiffs invoked their race in any way. The record is clear that the bullying Plaintiffs experienced from co-workers—such as the word "rat" being written on Parker's timecard slot one time, prank calls to Browne calling him a "rat", and Plaintiffs' timecards going missing—occurred because Plaintiffs were perceived as "snitches" who might report their co-workers to supervisors or otherwise side against correction officers. The record is also clear that other correction officers besides Plaintiffs were assigned to the COVID-19 quarantine housing units multiple times. (56.1 Stmt. ¶ 12). Plaintiffs' mere speculation that staffing decisions were made in a racially discriminatory manner, without more, does not create a genuine dispute of material fact. Moreover, it is undisputed that Plaintiffs were awarded their preferred posts after being promoted from resource officers. Plaintiffs have failed to adduce any evidence beyond the four corners of their own minds that the conduct at issue occurred because of Plaintiff's race.

Plaintiffs also argue that the hostile work environment was race-based because Plaintiffs "were aware of other disparate treatment and outright discrimination against other minority officers." (Pl. Br. at 19). Plaintiffs specifically cite to (i) Smallwood's complaint that he overheard unidentified correction officers referring to rioters in the news as "monkeys" (Sussman Decl., Ex. 57); (ii) Lassiter's complaint that Watch did not want to work with him (*id.*, Ex. 55); (iii) Tacorante's complaint other officers were spreading rumors that he was giving bus rides to inmates without bus passes (*id.*, Ex. 62); and (iv) Noble's complaint regarding the removal of her timecard from its slot and that she was not allowed to swap shifts with Browne (*id.*, Ex. 56). Defendants argue that the statements made by Smallwood, Lassiter, and Tacorante "are inadmissible hearsay that cannot be considered on the instant summary judgment motion." (Reply at 4-5 (citing *Leeber*

*Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 600-01 (S.D.N.Y. 2018), *aff'd*, 798 Fed. Appx. 682 (2d Cir. 2019)). That is absolutely true and a separate reason to exclude the evidence. Separately, Defendant argues that the "me too" evidence is not relevant and as such is likewise inadmissible at the summary judgment stage. (Reply at 5-6). The Supreme Court held in *Sprint/United Mgmt. Co. v. Mendelsohn*, that "evidence of discrimination by other supervisors is neither *per* se admissible nor *per se* inadmissible." 552 U.S. 379, 388 (2008). Courts have identified a number of factors that "should be considered when determining the admissibility of such "me too" evidence:

> 1) Whether the evidence is logically or reasonably tied to the decision made with respect to the plaintiff; 2) Whether the same 'bad actors' were involved in the 'other' conduct and in the challenged conduct; 3) Whether the other acts and the challenged conduct were in close temporal and geographic proximity; 4) Whether decision makers within the organization knew of the decisions of others; 5) Whether the other affected employees and the plaintiff were similarly situated; and 6) The nature of the employees' allegations.

*Dotson v. City of Syracuse*, No. 11-CV-00620, 2019 WL 6337326, at *3-4 (N.D.N.Y. Nov. 27, 2019) (citing *Schneider v. Regency Heights of Windham, LLC*, No. 14-CV-00217, 2016 WL 7256675, at *12 (D. Conn. Dec. 15, 2016)). With respect to the first factor, only Noble's complaints regarding her timecards and her requests to swap shifts with Browne are "logically or reasonably tied" to Plaintiffs. *Id.* The complaints made by Smallwood, Lassiter, and Tacorante have no logical connection to the harassment directed at Plaintiffs. With respect to the second factor, only Lassiter specifically identifies a "bad actor" involved—Correction Officer Watch—in his complaint. Plaintiffs do not adduce any evidence that Watch participated in any of the harassing conduct directed at them, and so this factor cuts against admissibility. With respect to the third factor, the conduct complained of by Smallwood, Lassiter, Tacorante, and Noble occurred during the same two-year period at issue in this litigation and at Otisville, so this factor cuts in favor of

admissibility. With respect to the fourth factor, the complaints were all memorialized in To/From memoranda to supervisors at Otisville, so this factor too cuts in favor of admissibility. With respect to the fifth factor, Plaintiffs have not established that these other correction officers are similarly situated to them, either through rank, seniority, or some other metric, so this factor cuts against admissibility. With respect to the sixth factor, none of the complaints involve any racially discriminatory comments directed at Smallwood, Lassiter, Tacorante, or Noble. The only comment that comes close was made by some unidentified correction officers—and overheard by Smallwood—referring to rioters in the news as "monkeys." (Sussman Decl., Ex. 57). This was not directed at Smallwood or any other correction officer and therefore the sixth factor cuts against admissibility.[4] Finally, the totality of the comments proffered as "me too" evidence are made by correction officers, and not supervisors. This additional fact makes the "me too" evidence all the more irrelevant. The Court concludes, after considering the factors enumerated in *Dotson*, that the "me too" evidence is not closely related "to [Plaintiffs'] circumstances and theory of the case" and therefore is not admissible. 2019 WL 6337326, at *3-4.

Plaintiffs' failure to produce any evidence of a causal connection between their race and the harassing conduct at issue here constitutes "a failure of proof and is insufficient to create a genuine dispute of material fact." Under these circumstances, Defendants are entitled to summary judgment on Plaintiffs' Title VII hostile work environment claim.

---

[4] Even if the comment Smallwood overheard was admissible, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Miller v. New York State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022). Once instance of a racist comment overheard by Smallwood would not therefore transform the work environment into a hostile or abusive one.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion sequence pending at

Doc. 60 and close this case.

**SO ORDERED:**

Dated:   White Plains, New York
         March 1, 2024

_____

PHILIP M. HALPERN
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
ROBERTO BROWNE and JADE N. PARKER,

               Plaintiffs,

    -against-

NEW YORK STATE DEPARMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION,

               Defendant.
---------------------------------------------------------X

21 **CIVIL** 5240 (PMH)

## <u>JUDGMENT</u>

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated March 4, 2024, Defendant's motion for summary

judgment is GRANTED; accordingly, the case is closed.

**Dated:** New York, New York

     March 22, 2024

                              **RUBY J. KRAJICK**

                           _____
                              **Clerk of Court**

               **BY:**       *K. Mango*

                              _____
                              **Deputy Clerk**